## DANISH PRIDE MILK PRODUCTS CO. v. PAUL STUPPEL, Inc.

(Circuit Court of Appeals, Seventh Circuit. January 3, 1922.)

No. 2987.

Sales ⬡⇒177—Facts held not to authorize cancellation of contract by seller.

> A contract for sale of 10,000 cases of condensed milk, to be shipped under buyer's labels and delivered f. a. s. New York, *held* not subject to cancellation by the seller after shipment of 2,000 cases, because the labels furnished were a few short of the total number required, of which fact the buyer was not notified, nor because, owing to delay in obtaining shipping permits, the buyer directed shipment to stations in New York other than the docks, which change was immaterial to the seller.

In Error to the District Court of the United States for the Eastern District of Wisconsin.

Action at law by Paul Stuppel, Inc., against the Danish Pride Milk Products Company. Judgment for plaintiff, and defendant brings error. Affirmed.

James H. McGillan, of Green Bay, Wis., for plaintiff in error.

G. T. Gifford and Joseph Martin, of Green Bay, Wis., for defendant in error.

Before BAKER, ALSCHULER, and EVANS, Circuit Judges.

EVAN A. EVANS, Circuit Judge. Defendant prosecutes this writ of error to review a judgment based upon a directed verdict entered in a

---

trial of an action growing out of a contract for the sale of 10,000 cases (48 cans to a case) of condensed milk which it, as the manufacturer at Denmark, Wis., sold to the plaintiff, a jobber in New York. The material portions of the contract provided that the commodity was—

"To be shipped under buyers' labels. * * * Labels to be in packer's hands in time for shipment."

"G. O. C. permits, routing instructions, and any special case markings to be furnished by buyer before time of shipment."

"Terms. Draft against bill of lading less 2 per cent., payment upon arrival of car f. a. s. New York."

"Shipment. During April, 1919, on buyer's instructions."

The evidence showed that the contract was made March 14, 1919; that the price of condensed milk was rising; that plaintiff, March 19th, gave its order for 500,000 labels to a lithographic company, which, in turn, delivered the labels so ordered to defendant prior to April 15th, but which labels, when counted, numbered only 492,000, or 8,000 less than the required number. On April 15th defendant wired to plaintiff saying, among other things, "Labels have arrived," and at no later date complained that any part of the 500,000 had not been received.

During the war, because of the congested condition of freight at the docks in New York, the government appointed a committee known as the general operating committee to control the arrival and departure of freight. Before merchandise would be received on the docks, permits, known as G. O. C. permits, were required, and these were not issued unless the shipper could show the committee that it had "bottoms sufficient to take the freight aboard." Plaintiff experienced some difficulty in getting these permits. On March 26th plaintiff directed the shipment of 1,000 cases of the milk, but did not inclose the permit, and later advised the defendant that it was unable to get the permit, adding:

"Inasmuch as we are anxious to receive the merchandise, we would ask you to please forward same without such permits and name the Franklin Street station for delivery."

At the same time plaintiff requested defendant to have 1,000 more cases marked ready for shipment and permits would soon follow. To this letter the defendant replied that the—

"railroad agent refused to accept car without G. O. C. permit. Have two cars on track loaded. * * * Please do utmost to wire us G. O. C. permit number, routing instructions, or will be forced to cancel contract."

Plaintiff wired reply on the 17th as follows:

"Ship both cars any available route. Deliver downtown district New York, preferably Franklin Street station or St. Johns Park. Under these circumstances, G. O. C. permit unnecessary as waiving lighterage."

On the same day a letter was sent, repeating words of telegram and inclosing permit to ship 1,000 cases. On April 28th a telegram was sent, directing the shipment of 2,000 cases—

"any available route. Deliver downtown district New York, preferably St. Johns Park or Franklin Street station."

On April 29th plaintiff wired these directions:

"Ship additional 5,000 cases. * * * Any available route. Deliver downtown district New York, preferably St. Johns Park or Franklin Street station. This completes contract of March 14th. * * *"

Defendant complied with the first two orders and shipped 2,000 cases, but refused to ship any part of the remaining 8,000 cases. This action was for damages for breach of contract, and parties agreed upon the amount, if any were recoverable. Defendant relies upon two defenses as justification for its refusal to make shipment: (a) Plaintiff's failure to furnish a sufficient number of labels; (b) plaintiff's change in the contract in reference to point of destination.

(a) As to the labels, defendant's position is untenable, first, because it advised plaintiff that the labels were on hand, and never again notified it that the number received was a few short of the total requirements. Further, plaintiff had on hand over 300,000 unused labels furnished by defendant when it breached its contract, and had it notified plaintiff that the shipment from the lithographic company was short, the additional ones could have been promptly supplied. Nothing appears in the record that would have presented a jury question on this phase of the case.

(b) In reference to the alleged change in the contract made by the plaintiff, wherein he designated a point of shipment other than that named in the contract, we likewise agree with the District Judge that the sale was not necessarily made for export. While the purchaser designated the point of shipment f. a. s. New York, we find nothing which bound the purchaser to export the milk. Does it follow that, because the seller was required to ship the milk to a point where it could be readily exported, the purchaser was thereby limited to ordering for export shipment? We think not. Such changes as were made in point of shipment were for defendant's benefit and to its advantage, for it made earlier payment possible.

But if the sale of the milk was for export trade, if that fact be material, there is nothing in the evidence indicating or tending to show that plaintiff, because it changed the point of destination, thereby intended to sell the milk for domestic use. If the fact that the parties intended the sale for export can be read into the contract, then nothing which the plaintiff did indicated a change in its plans. The letters and telegrams show clearly that plaintiff wished to have the milk delivered as near to the seaboard as possible, and that it expected to get the milk on board a ship, once it reached the railroad terminal in New York.

In this court it is argued that the shipping orders were not received in time to permit defendant to load the cars during the month of April. This point is an afterthought. It was never suggested to plaintiff that defendant might not be able to load the last five cars by April 30th, nor was it required to do so. The contract contemplated the giving of shipping orders during the month of April, and defendant was to fill the orders within a reasonable time.

The judgment is affirmed.